UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 6:13-CR-00073

VERSUS                            JUDGE FOOTE

ROBERT WILLIAMSON                 MAGISTRATE JUDGE HANNA

## PROPOSED FINDINGS OF FACT AND  RECOMMENDATION

Currently pending before this Court, on the referral from the district court pursuant to 28 U.S.C. §636(b)(1)(B), is the defendant's motion to suppress statements he made on February 27, 2012 while being questioned by FBI agents. (Rec. Doc. 126).  The motion is opposed.  (Rec. Doc. 130).  An evidentiary hearing was held on April 23, 2015. Testifying for the Government were FBI special agents Kasee Hatcher and Douglas Herman.  The defendant offered the testimony of FBI special agent Anne LaHaye and Joshua Hundley. The following are the Court's proposed findings of fact and recommendations for disposition.

## Proposed Findings of Fact

Robert Williamson is charged with one count of conspiracy in violation of 18 U.S.C. § 371, six counts of bribery in violation of 18 U.S.C. § 666(a)(2), one count of Social Security fraud in violation of 42 U.S.C. § 408(a)(4), and one count of making a false statement to a federal agent in violation of 18 U.S.C. § 1001, as well as a forfeiture charge, all in connection with an alleged scheme to secure "immediate

894 pleas" in driving-while-intoxicated cases charged by the district attorney for Louisiana's 15th Judicial District Court.  Agent Herman was the case agent assigned to the investigation of the defendant's involvement with suspected corruption in the office of the district attorney.  Agent Hatcher was also involved in that investigation. The testimony offered by Agents Hatcher and Herman was substantively consistent.

On February 27, 2012, search warrants were simultaneously executed at the home of Willaimson, as well as his truck, at the office of Barna Haynes at the District Attorney's office, and on Ms. Haynes's vehicle. Agent Hatcher was the primary team leader for the search of Williamson's home and truck.  She arrived at his home at approximately 8:10 p.m., along with FBI Agent Troy Chenevert and approximately ten additional law enforcement agents.

A form prepared from Agent Hatcher's notes[1] listed the names of eighteen officers who participated in the execution of the search warrants at Williamson's residence.  The officers were armed.  Some of the officers secured the perimeter, some searched his vehicle, some searched his home, and some interviewed Williamson.  Some of the officers parked their vehicles in Williamson's driveway, efffctively blocking in his vehicle, and Williamson's car keys were taken from him so that his vehicle could be searched.

---

[1]    The 302 form was referred to during the hearing but was not entered into evidence.

Upon arriving at Williamson's residence, Hatcher and Chenevert knocked on the door and announced that they were with the FBI.  Williamson answered the door and let Hatcher and Chenevert in.  Hatcher explained to Williamson that he was not under arrest, that the officers were there to execute search warrants, and that he was free to leave at any time. However, if he chose to leave, he would not be permitted to come back in until after the search was completed.  Williamson's wife and grandson were present at his residence when the  officers arrived.  They were permitted to leave when Williamson's daughter came and picked them up.

Upon her arrival, Agent Hatcher also informed Williamson that she wished to talk with him about "his involvement with 894's and the DA's office."  She advised Williamson that he did not have to answer her questions and she also advised him that he could discontinue the interview at any time.  Williamson agreed to talk with her. Hatcher expressly testified that she did not force Williamson to talk with her, did not threaten him, and did not coerce him.

At approximately 8:30 to 8:45 p.m., Hatcher, Chenevert, and Williamson sat at the dining room table and Hatcher interviewed Williamson for approximately forty-five minutes.  She did not read Williamson his *Miranda* rights, and she did not tape record the conversation.   According to Hatcher, the interview was never confrontational, and Williamson remained focused and did not seem confused by her

-3-

questions.  At all times during her conversation with Williamson, it appeared to her that his conversation with her was free and voluntary. During the interview, Williamson retained possession of his cell phone and was allowed to take calls.  He was not handcuffed at any time.

When the search commenced at the Williamson residence, Agent Herman was at the FBI office interviewing Ms. Haynes.  At approximately 9:15 p.m., he arrived at Williamson's home along with Task Force Officer Corey Clause.  According to Agent Herman, Williamson's wife and grandson had already left the premises.

When Herman arrived, Chenevert stopped participating in the interview. Herman took over the questioning from Hatcher, but Hatcher remained at the table taking notes.  Clause was also at the table.  Herman asked Williamson if he could continue the interview, and Williamson agreed to do so.  Herman told Williamson that he had no intention of arresting Williamson that night.  He also advised Williamson that he was not in custody, that he was not under arrest, that he was free to leave at any time, that he could discontinue the interview at any time, and that he did not have to answer questions.  Herman testified that Williamson said he understood.

Herman interviewed Williamson for approximately forty-five minutes or until about 10:00.  Herman testified that he did not coerce or threaten Williamson.  He also

-4-

stated that Williamson did not ask to end the interview at any time.  According to Herman, Williamson appeared to understand the questions that were asked.  He appeared a little nervous, hesitated before answering Herman's questions, but seemed lucid.  Hatcher testified that the conversation did not at any time after Herman arrived become confrontational.

During Herman's testimony,  tape recordings of portions of fourteen telephone conversations that Williamson engaged in before, during, and after the execution of the search warrants were played and entered into evidence.  The recordings were obtained through an authorized wire tap of Williamson's telephone.   Herman confirmed that Williamson was not prevented from answering his telephone during the execution of the search warrants.   He confirmed that, in the phone calls, Williamson reassured his daughters that "everything's fine" (Government's Exhibit 1, phone call no. 5); "everything's good" (Government's Exhibit 1, phone call no. 5); "everything is nice" (Government's Exhibit 1, phone call no. 6); that his grandson and wife were OK (Government's Exhibit 1, phone call no. 6); and that "everything's OK" (Government's Exhibit 1, phone call no. 7).  A little after midnight, while the search was still ongoing, he told his son that the agents were not going to take him to jail.  (Government's Exhibit 1, phone call no. 10).  When Williamson spoke with Grady Abraham at about 2:02 a.m., after the conclusion of the execution of the search

warrants, Williamson stated that the agents had told him he was not under arrest and he acknowledged that the law enforcement personnel did not touch any of his personal items but took only paperwork associated with his business interests. (Government's Exhibit 1, phone call no. 11).  When Williamson spoke with his son at about 8:00 p.m. on March 1, 2012 (Government's Exhibit 1, phone call no. 14), he stated that the agents "were nice to me.  They treated me like a human."

It is undisputed that Williamson was not *Mirandized* or arrested.  No evidence was presented demonstrating that Williamson asked, at any time, that the interview be discontinued.

## Contentions of the Parties

Williamson contends that he was in custody on February 27, 2012, when he was interviewed by law enforcement agents while his home was searched.  Because he was not read his *Miranda* rights, he contends that the incriminating statements he made during the interview cannot now be used against him.

The Government contends that Williamson was not in custody on February 27, 2012, when he was interviewed.  Therefore, the Government contends that Williamson's statements were freely and voluntarily given, there was no need for *Miranda* warnings, and the statements need not be suppressed.

## <u>Applicable Law and Analysis</u>

The Fifth Amendment to the United States Constitution prohibits compelled self-incrimination.   In *Miranda v. Arizona*, the United States Supreme Court recognized the "inherently compelling pressures" of custodial interrogation[2] and prescribed certain prophylactic measures that must be applied in such a situation.  It is now well-settled that "[t]he Government must administer *Miranda* warnings before custodial interrogations."[3]  Furthermore, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[4]

In *Miranda*, the Supreme Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[5]  Determining whether a person is "in custody" requires an objective inquiry that depends on the

---

[2]      *Miranda v. Arizona*, 384 U.S. 436, 467 (1966).

[3]      *United States v. Chavira*, 614 F.3d 127, 132 (5th Cir.2010).  See, also, *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988).

[4]      *Miranda v. Arizona*, 384 U.S. at 444.  See, also, *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

[5]      *Miranda v. Arizona*, 384 U.S. at 444.

-7-

"totality of circumstances."[6]  A suspect is "in custody" for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.[7]  Two separate inquiries are essential to the determination: the particular circumstances surrounding the interrogation and, in light of those circumstances, whether a reasonable person would have felt that he was at liberty to end the interrogation and leave.[8]  Important factors to consider include: (1) the length of the questioning, (2) the location of the questioning, (3) the accusatory, or non-accusatory, nature of the questioning, (4) the amount of restraint on the individual's physical movement, and (5) statements made by officers regarding the individual's freedom to move or leave.[9]  In this case, an evaluation of these factors demonstrates that Williamson was not in custody when he was questioned on February 27, 2012, a reasonable person in Williamson's position would have felt at liberty to end the interrogation and leave, and the law enforcement officers did not err in failing to read the *Miranda* warnings to Williamson.

---

[6]    *United States v. Wright*, 777 F.3d 769, 774 (5th Cir.2015).

[7]    *United States v. Wright*, 777 F.3d at 774; *United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006); *United States v. Bengivenga*, 845 F.2d at 596.

[8]    *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012).

[9]    *United States v. Wright*, 777 F.3d at 775.

The first factor to consider is the length of the questioning.  In this case, it is undisputed that Agent Hatcher interviewed Williamson for about forty-five minutes and then Agent Herman interviewed him for approximately forty-five minutes more, for a total period of about an hour and a half.  "[I]nterrogations in excess of an hour may, in appropriate circumstances, require *Miranda* warnings, and. . . certain statements elicited incident to lengthy detentions may have to be suppressed."[10] However, there is no set time limit for authorities to question a detainee before triggering *Miranda*.[11]  While "[c]ourts have generally held that confessions after short periods of time do not evidence coercion,"[12] the Fifth Circuit, has emphasized that the length of the interrogation is only one of the many factors to be considered.

> [A] detention of approximatley [sic] an hour raises considerable suspicion.  We note, however, that neither the agents nor the detainee accurately knows in advance his expected delay.  Overreliance upon the length of the delay thus injects a measure of hindsight into the analysis which we wish to avoid.  Accordingly, we reject the broad proposition that a short delay constitutes per se a noncustodial interrogation or that an hour-long delay constitutes a per se custodial interrogation.  It is but one,

---

[10]      *United States v. Harrell*, 894 F.2d 120, 124 (5th Cir. 1990).

[11]      *United States v. Texas Oil & Gathering, Inc.*, No. 4:07-CR-00466, 2009 WL 742616, at *4 (S.D. Tex. Mar. 20, 2009); *United States v. Harrell*, 894 F.2d at 124.

[12]      *United States v. Salazar*, 997 F. Supp. 2d 549, 561 (W.D. Tex. 2014), citing *United States v. LeBrun*, 363 F.3d 715, 726 (8th Cir. 2004).

albeit important, factor to consider in applying our
objective standard. . . .[13]

The undersigned finds that the interviews in this case, which totalled approximately

an hour and a half, but were interrupted by the replacement of Agent Hatcher by

Agent Herman and at least four telephone calls, were not so prolonged as to require

that they be characterized as custodial in nature.

The second factor to consider is the location of the questioning.  When a

defendant is interrogated in his own home, the likelihood of coercion is lessened.[14]

But there is no "simple in-home vs. out-of-home dichotomic analysis"[15] and other

factors may "weigh against the presumption that an in-home interrogation is non-

coercive."[16]  Williamson was questioned only in his home.  This factor weighs in

favor of a finding that the interview was noncustodial in nature.

The third factor to consider is whether the questioning was accusatory in

nature.  Being singled out at the start of the execution of a search warrant can make

---

[13]     *United States v. Harrell*, 894 F.2d at 124 n. 1.

[14]     See *United States v. Fike*, 82 F.3d 1315, 1325 (5th Cir. 1996) ("questioning in one's own home in the presence of other family members is less coercive than questioning in a station house or other official location"), overruled on other grounds by *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998), abrogated by *United States v. Cantu*, 230 F.3d 148 (5th Cir. 2000).

[15]     *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012).

[16]     *United States v. Cavazos*, 668 F.3d at 194.

the interview accusatory.[17]  "The awareness of the person being questioned by an officer that he has become the 'focal point' of the investigation ... may well lead him to conclude, as a reasonable person, that he is not free to leave, and that he has been significantly deprived of his freedom."[18]  Similarly, being told that the policemen know that the defendant is not telling the truth might indicate that the questioning is accusatory.[19]  No evidence was presented at the hearing demonstrating that Williamson's veracity was called into question by the interviewing agents.  However, Williamson was singled out when the agents first arrived at his home and it was made clear to him that he was a focal point of their investigation.  By the same token, however, the interview was, by all accounts – that of Williamson, Hatcher, and Herman – cordial in nature.  Williamson told his son that two of the agents in particular – Herman and Donald Bostick – were nice to him.  Williamson's son-in-law, Joshua Hundley, testified that he received two telephone calls that evening from an agent involved in executing the search warrants.  He stated that the first call was a courtesy call to let the family know that the search was ongoing and the second call

---

[17]     See *United States v. Ortiz*, 781 F.3d 221, 233 (5th Cir. 2015); *United States v. Cavazos*, 668 F.3d at 194-95.

[18]     *United States v. Bengivenga*, 845 F.2d at 597 n. 16 (emphasis and citation omitted).

[19]     See *United States v. Chavira*, 614 F.3d at 133-34, as explained in *United States v. Wright*, 777 F.3d 775.

was to alert the family to the agent's concern about Williamson's health.  He referred to the agent who called him as a "gentleman" and described him as "polite."  No evidence indicated that the interview was ever adversarial, confrontational, or hostile.

The fourth factor is the amount of restraint on the defendant's movement during the interview.  In this case, there were eighteen law enforcement officers at Williamson's residence.  There is no evidence that any of the were the officers in plain clothes.  Although the officers were all armed, there is no evidence that their weapons were drawn at any time.  Williamson was not handcuffed at any time, even at the start of the search when the officers were determining who all was in the house.  Williamson was permitted to walk around during the search but he was accompanied by a law enforcement officer at all times to ensure that he did not impede the search.  He was also allowed to use his cell phone during the interview, receiving at least four telephone calls during the interview and talking with his attorney after the conclusion of the interview but before the search was finished.  A photograph entered into evidence at the hearing showed Williamson sitting at the dining room table during the interview.  (Defendant's Exhibit 3).  A telephone call with one of Williamson's daughters verified that Williamson could be seen from the street sitting at the dining room table.  (Government Exhibit 1 at phone call no. 9).  The restrictions placed on

Williamson were less severe than those in some cases in which it was determined that the defendant was not in custody.[20]

The fifth factor to consider is what the law enforcement officers told the defendant concerning his ability to leave the interview site.  However, statements by the officers that the interview is noncustodial, that the defendant is not under arrest, or that the defendant is free to go are not controlling.  Although such statements are relevant to a *Miranda* analysis, they are not talismanic.[21]  The Fifth Circuit has stated that the use of the term "noncustodial" may not convey to a lay person that he is free to leave, while the terms "free to leave" and "wasn't under arrest" are more easily understood.[22]  In this case, both Agent Hatcher and Agent Herman testified that, on multiple occasions, they advised Williamson that he was not under arrest and that he was free to leave.  Williamson acknowledged in a phone call with his son that he was not going to be taken to jail.  (Government's Exhibit 1 at phone call no. 10).  He told

---

[20]    *United States v. Reyna*, No. SA-13-CR-417-XR, 2015 WL 1310392, at *4 (W.D. Tex. Mar. 24, 2015); *United States v. Fike*, 82 F.3d 1315, 1325 (5th Cir. 1996) overruled on other grounds by *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (holding a defendant was not in custody for Miranda purposes after officers violently entered the house and pointed guns at the defendant for the first few minutes of executing a search warrant); *United States v. Wright*, 777 F.3d at 776 n. 3 (finding an interrogation was non-custodial where "at the very most, [the defendant] was handcuffed for 10–15 minutes along with other occupants of the home" when officers first entered the home, and the defendant was not handcuffed during the interview in question.").

[21]    *United States v. Cavazos*, 668 F.3d at 195.

[22]    *United States v. Wright*, 777 F.3d at 776.

-13-

Grady Abraham that he had been told he was not under arrest. (Government's Exhibit 1 at phone call no. 11). This confirms both the testimony of the FBI agents and Williamson's understanding that he was not then under arrest and would not be arrested that night. The mere fact that Williamson chose not to leave the scene does not mean that he did not understand that he could leave if he wanted to do so.

During the hearing, Williamson argued that the court should also consider two additional factors, i.e, surprise and a police dominated environment. In this case, Williamson was questioned coincident with the execution of search warrants. Surprise is a necessary concomitant of the execution of a search warrant. Therefore, this factor does not weigh in favor of finding that the questioning was custodial in nature.

Admittedly, there was a large law enforcement presence at Williamson's home on the night in question. Over the five hour period while the search warrants were executed, eighteen officers participated in some capacity. In a dissenting opinion, one Fifth Circuit judge noted that "when a traffic stop takes place on the street, the presence of passersby guards against actual police misbehavior and undercuts the police dominated environment."[23]  In this case, the relatively large number of law enforcement officers was explained by the nature of the search being undertaken. As

---

[23]     *United States v. Bengivenga*, 845 F.2d at 604.

Agent Hatcher testified, "We had indications throughout the investigation that there was a potential for a number of files and documents that he maintained at the residence, so we would want to be able to execute the search warrant, obtain those documents, and get out as expeditiously as possible."  Even with several officers present, it took approximately five hours to go through Williamson's work papers.  Some of the officers were present for the purpose of searching for and removing those documents, some were making sure that no one came into the house while the search was ongoing, some "maintain[ed] the security of the perimeter" of Williamson's property.

Agent Hatcher also testified there were additional factors necessitating a larger number of officers:  the search was conducted at night, the officers did not know when they arrived how many people were in the house, Williamson was known to associate with a criminal element in the community, and Williamson's home is in a highly visible high traffic area.  Thus, a concern for the safety of the officers involved in the search led law enforcement to bring more officers than they ordinarily might.  Significantly, however, only Hatcher and Chenevert and then only Herman, Clause, and Hatcher participated in the actual interviews.  Furthermore, the fact that the interviews were conducted at Williamson's residence rather than at a police station or similar facility minimizes the law enforcement officers' dominance of the

-15-

environment.  This factor does not tilt the scale in favor of finding that *Miranda* warnings were necessary.

The Government also suggested that another factor should be considered, arguing that Williamson's level of sophistication lessened the need for *Miranda* warnings.  The Government offered no authority for this argument, and none was found by the undersigned.  However, the undersigned does note that Williamson characterized himself as a criminal investigator (Government Exhibit 1 at phone call no. 3) and that he asked a lawyer within a couple of hours of the conclusion of the search whether the officers should have read him his rights and then recited those very rights himself. (Government Exhibit 1 at phone call no. 12).  The defendant's sophistication level cannot absolve the officers of their obligation to provide *Miranda* warnings during a custodial interrogation but it can demonstrate the defendant's understanding that he could have stopped the interview at any time or could have requested that he be questioned only with his attorney present.

Police officers are not required to administer Miranda warnings to everyone whom they question.[24]   A defendant who voluntarily gives a statement to law enforcement in a noncustodial situation need not be advised of his *Miranda* rights.  A statement or confession is voluntary if it is the product of the defendant's free and

---

[24]     *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

-16-

rational choice and made in the absence of official overreaching either by direct coercion or subtle psychological persuasion.[25]   A finding that a statement was voluntary is made on a case-by-case basis in light of the totality of the circumstances.[26]

When a statement is obtained without *Miranda* warnings being given, a presumption arises that the defendant's Fifth Amendment right against self-incrimination was violated.[27]   A statement obtained in violation of *Miranda* may be suppressed on that basis alone since the exclusionary rule "sweeps more broadly than the Fifth Amendment itself [and] may be triggered even in the absence of a Fifth Amendment violation."[28]   The Government has the burden of proving by a preponderance of the evidence that Williamson's statements were voluntary.[29]

---

[25]     *United States v. Bell*, 367 F.3d 452, 460–461 (5th Cir. 2004); *United States v. Mullen*, 178 F.3d 334, 341 (5th Cir. 1999).

[26]     *United States v. Cardenas*, 410 F.3d 287, 293 (5th Cir. 2005).

[27]     *Oregon v. Elstad*, 470 U.S. 298, 307 (1985); *United States v. Cherry*, 794 F.2d 201, 207 (5th Cir. 1986).

[28]     *Oregon v. Elstad*, 470 U.S. at 306; *United States v. Cherry*, 794 F.2d at 207.

[29]     *United States v. Anderson*, 755 F.3d 782, 790 (5th Cir. 2014); *United States v. Bell*, 367 F.3d at 461; *United States v. Mullin*, 178 F.3d at 341; *United States v. Restrepo*, 994 F.2d 173, 183 (5th Cir. 1993).  See, also, *United States v. Santos*, 66 F.3d 323 (5th Cir. 1995) (unpublished); *United States v. Ford*, 24 F.3d 238 (5th Cir. 1994) (unpublished).

In this case, the undersigned finds that the Government sustained its burden of overcoming the presumption that the Fifth Amendment was violated when Williamson was questioned by the FBI without first being read his *Miranda* rights. Taking into consideration the totality of the circumstances, the undersigned finds that the interview of Williamson on February 27, 2012 was not custodial in nature and a reasonable person in Williamson's position would have understood that he could stop the interview at any time and leave the premises – even if he chose not to do so. Accordingly, the undersigned recommends that the motion to suppress should be denied.

Signed at Lafayette, Louisiana on April 24, 2015.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

COPY SENT:

DATE:   4/24/2015
BY:        EFA
TO:        EEF
             kk

-18-